**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TRUSTEES OF THE CHICAGO | ) | |
| PLASTERING INSTITUTE | ) | No. 03 C 6867 |
| PENSION TRUST, et al, | ) | |
| | ) | Magistrate Judge Sidney Schenkier |
| Plaintiffs, | ) | |
| -vs- | ) | |
| | ) | |
| CORK PLASTERING CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendant, Cork Plastering Company, Inc. ("Cork"), by and through its attorneys, Alan

Garrow of Nealis & Garrow and Joseph Berglund of Berglund & Niew, submits the following

proposed Findings of Fact and Conclusions of Law following the bench trial of this matter:

**PROPOSED FINDINGS OF FACT**

**Preliminary Matters**

1.     This suit is brought pursuant to the Labor Management Relations Act, §301 and

§502(a)(3) of the Employee Retirement Income Security Act (ERISA) to compel an audit and for

purported contributions, interest, liquidated damages, audit fees and attorneys' fees.  This Court

has subject matter jurisdiction over the claims of the ERISA fund plaintiffs pursuant to 28 U.S.C

§1337 and 29 U.S.C §§185(c), 1132(e)(1).  (Stip. 1)

2.     The Defendant contends that the claims of the Plaintiffs involving non-ERISA funds

should be arbitrated and that the Court does not have subject matter jurisdiction over non-ERISA

fund claims.  (Stip. 2)

3.     Plaintiff Chicago Plastering Institute ("CPI") is a promotional trust fund that promotes

1

the plastering industry and Plaintiff Chicagoland Safety Council ("CEA") is an area wide safety council for whom the CPI collects and forwards contributions to the CEA.  CPI AND CEA are non-ERISA funds.  (Stip. 4; C. Fester Tr. p. 229)

4.    Cork is an Illinois corporation that operated during the period February 1, 1993 through November 12, 2002 (the "audit period") as a plastering contractor.  (Stip. 7)

5.    For the period 1993 through 2000, Mr. Palicsek was the President and sole shareholder of Cork.  From 2000 through 2002, Cork's shareholders and officers were Palicsek, Rick Nevious, John Bagjas, and Lorand Stranyiczki.  (Stip. 8)

#### Collective-Bargaining Relationships

6.    The Chicagoland Association of Wall and Ceiling Contractors ("CAWCC") is a voluntary membership organization that negotiates collective bargaining agreements with Plasterers Local 5.  (Stip. 9)

7.    Cork executed various Memoranda of Understanding associated with the Local 5 Agreements.  (Stip. 17)

8.    The Local 5 Agreements provide for terms and conditions of employment for employees performing plastering work within the geographical jurisdiction of Local No. 5.  (Stip. 11)

9.    The geographical jurisdiction of Local 5 during the audit period included Cook, Will, Kane, McHenry, DeKalb, Kendall, Grundy, LaSalle and Livingston Counties.  (Stip. 12)

10.    Throughout the audit period, Cork remitted contributions pursuant to the Local 5 Agreements to the Local 5 Funds.  (Stip. 20)

11.    The CAWCC also negotiated collective bargaining agreements with the International Union of Bricklayers and Allied Craftsmen, Locals No. 56 and 74 of DuPage County (jointly

"Local 56") which provide for terms and conditions of employment for employees performing plastering work within the geographical jurisdiction of Local 56.  (Stip. 21)

12.   The geographical jurisdiction of Local 56 is DuPage County.  (Stip. 22)

13.   Cork was also a party to collective bargaining agreements with the Lake County, Illinois Plasterers' Union Local 362/11, which provide for terms and conditions of employment for employees performing plastering work within the geographical jurisdiction of Local 362/11. (Stip. 25)

14.   The geographical jurisdiction of Local 362/11 is Lake County, Illinois.  (Stip. 26)

15.   Throughout the audit period, Cork performed work in the geographical jurisdictions of Local 5, Local 56, and Local 362.  (Stip. 28)

16.    In 2002, the National Labor Relations Board conducted an election amongst Cork's plastering employees to determine which union would be their exclusive bargaining representative. On November 14, 2002, the NLRB certified the International Union of Bricklayers and Allied Craftworkers, locals 56 and 74, AFL-CIO, as the exclusive bargaining representative of such employees.  (Stip. 29)

### Reciprocal Agreements and "Money-Follows-the-Man"

17.   During the audit period, the CPI Pension Fund had a reciprocal agreement with the Masons and Plasterers Pension Fund, Local Union No. 74 of DuPage County, and the Masons and Plasterers Pension Fund, Local Union No. 56 of DuPage County.  For the same period of time the CPI health and welfare fund had a reciprocal agreement with the Bricklayers and Allied Craft Workers Local 74 welfare fund and the Brick Masons welfare fund DuPage County Local 56 (respectively "reciprocal funds" and "reciprocal agreements").  (Stip. 30)

18.   In 1991, the Illinois District Council O.P. and C.M.I.A.  ("OP Council") which

3

consisted of certain Operating Plasterers and Cement Mason locals including Plasterers Local 5

and Plasterers Local 362, passed a motion requiring contractors employing members of the

Council to pay wages according to the member's home local and to pay benefits and working

assessments directly to the member's benefit office and local union, regardless of where the

employee works within the District Council ("Money-Follows-the-Man"). (Stip. 31)

### The Audit

19. On December 3, 2002, the Local 5 funds sent Cork a letter advising Cork that it was

going to be audited by the Local 5 funds' auditors, the accounting firm of Piotrowski & Gebis.

("P&G") for the period February 1, 1993 through November 14, 2002. (Stip. 32)

20. P&G, at the instruction of the Local 5 funds' trustees, began the payroll audit of Cork

on or about February 10, 2003. (Stip. 33)

21. On September 29, 2003, the complaint in this lawsuit was filed against Cork. (Stip. 35)

22. In April 2004, P&G issued its audit report for the audit period. (Stip. 36) The audit

report is actually the result of data compilations made by P & G pursuant to an agreed upon

procedures engagement between the Plaintiffs and P & G and does not constitute and audit or an

audit opinion. (G. Gebis Tr. p. 113, 114 and 115)

23. The Local 5 funds have withdrawn any claim for contributions owed for the period of

February 1, 1993 through September 30, 1993. (Stip. 37)

### The Audit Report and Cork's Response

24. The audit report issued by P&G was provided to Cork's counsel during the pendency

of this lawsuit. (Stip. 38)

25. Cork issued a color-coded response to the additional hours claimed as owed by the

audit report. (Stip. 39) See, Defendant's Exhibit 15.

**Geographic Jurisdiction**

26.   In the audit report, P&G assumed that all work was performed within the geographical jurisdiction of Local 5.  Thus for all hours worked in Local 56 geographical territory by Cork employees for which contributions were remitted to the Local 56 funds, P&G included such hours in the audit report which Local 5 now claims are due.  (Stip. 40)  The hours reported to Local 56 were not traced and eliminated as articulated in the agreed upon procedures engagement.  (G. Gebis Tr. p. 131-134; F. Lee Tr. p. 530-531)

27.   The audit report does not include contributions due to the CPI pension fund and the CPI health and welfare fund because such contributions were subject to the reciprocal agreement and had these contributions been collected by the Local 5 funds, they would have been reciprocated to the Local 56 funds for the Local 56 members.  (Stip. 40)

28.   All hours coded in yellow by Cork designate hours worked by Cork employees that Cork claims were worked outside of Local 5's geographical jurisdiction and for which Cork made contributions to the Local 56 funds.  (Stip. 41)

29.   Local 5 has no valid claim for contributions for work done in Local 56 territory.  (Stip. 42; G. Holdway Tr. p. 34; G. Gebis Tr. p. 142)

**Bonus Hours**

30.   Throughout the audit period, Cork made payments to its employees that it designated in its payroll records as "bonuses."  (Stip. 44)

31.   Cork did not have any written procedures by which it made these payments designated as "bonuses."  (Stip. 45)

32.   In the audit report, P&G assumed that the payments designated by Cork as "bonuses" were payments for hours worked and assessed contributions for those hours on the final audit

5

report.  (Stip. 46)

33.   All hours coded in orange on the audit report by Cork designate hours calculated as additional hours worked in the audit report and for which Cork claims were bonus payments and not hours worked.  (Stip. 47)

34.   The collective bargaining agreement does not prohibit bonuses or additional compensation not predicated on hours worked.  (Stip. 48)

35.   No contributions are due to the Local 5 funds for bonus payments made to plasterers that are not predicated on hours worked or in lieu of wages.  (Stip. 49)

**Shop Labor**

36.   All hours coded in pink on the audit report by Cork designate hours calculated as additional hours worked in the audit report and for which Cork claims were hours worked in the shop and thus not for bargaining unit work for which hours are due.  (Stip. 50)

37.   No contributions are due to the Local 5 funds for shop labor doing non-bargaining unit work.  (Stip. 50 and 53)

**Management**

38.   All hours coded in purple on the audit report by Cork designate hours calculated as additional hours worked in the audit report and for which Cork claims were hours worked by management individuals and thus not for bargaining unit work for which hours are due.  (Stip. 51)

39.   Contributions are not due for hours worked by management individuals engaged in non-bargaining unit work.  (Stip. 51 and 54)

**Contributions Paid**

40.   All hours coded in green on the audit report by Cork designate hours calculated as

additional hours worked in the audit report and for which Cork claims contributions to the Local 5 Funds were remitted.  (Stip. 52)

    41.   The CEA is not an ERISA fund.  (Stip. 55)

    42.   Regardless of whether payments were made to the Local 5 funds or the Local 56 funds, the CEA contributions are forwarded to CEA.  (Stip. 56)

    43.   Cork had an employee, Josef Tajstrzyk, who was killed in a car accident on May 9, 1997.  Subsequent to his death Cork made payments to his widow that were not predicated on hours worked.  (Stip. 57)

## WITNESS TESTIMONY

## GERALD HOLDWAY

    Gerald Holdway was a trustee of the Local 5 funds and was President of Local 5.  He was called as a witness and testified as follows:

    44.    The audit of Cork was an exit audit. (Tr. p.33)

    45.    If Cork performed a job in DuPage County it was not required to remit contributions to Local 5. (Tr. p. 34)

    46.    There were no job site violations by Cork and there were no grievances filed as a result of any discrepancies by Cork at any job sites. (Tr. p. 37 and 38)

    47.    There were no Local 56 members working in Local 5 territory at any Cork job sites. (Tr. p. 38)

    48.    There were no Local 11 members working in Local 5 territory at any Cork job sites. (Tr. p. 38)

    49.    There were no non-union members doing bargaining unit work at any Cork job sites. (Tr. p. 38)

50.     There is no evidence that either Local 56 or Local 11 union members did work in Local 5 territory at any Cork job sites. (Tr. p. 38)

51.     No contributions are due to the Local 5 funds if a member of Local 56 is working in Local 56 territory. (Tr. p. 38 and 39)

52.     No contributions are due to the Local 5 funds if a member of Local 11 is working in Local 11 territory. (Tr. p. 39)

53.     Local 5's claims for contributions for work done by Local 56 members in Local 56 territory should not be part of the audit. (Tr. p. 39)

54.     Local 5's claims for contributions for work done by Local 11 members in Local 11 territory should not be part of the audit. (Tr. p. 39)

55.     Invoices showing job location is sufficient to establish the location of jobs performed by Cork. (Tr. p. 39)

56.     The assumption that all work was done in Local 5 territory is an invalid assumption. (Tr. p. 40)

57.     No contributions are due to the Local 5 funds for a contractor's office workers. (Tr. p. 41)

58.     No contributions are due to the Local 5 funds for a contractor's shop labor engaged in non-bargaining union work. (Tr. p. 41)

59.     Local 5's claims for contributions for non-union members doing non-bargaining unit work in Cork's warehouse should not be part of the audit. (Tr. p. 41)

60.     No contributions are due to the Local 5 funds for payments made to a widow after her husband's death. (Tr. p. 41)

61.     Holiday bonuses are not subject to contributions to the Local 5 funds. (Tr. p. 42)

8

62.     No contributions are due to the Local 5 funds for discretionary bonuses that are not predicated on hours worked. (Tr. p. 42)

63.     For reciprocity purposes, the funds assume that if the hours were not reported to them that the hours were worked in a different jurisdiction. (Tr. p. 46)

64.     The Local 5 funds were not aware of the assumptions the accountants were making with regard to the location of the work. (Tr. p. 46 and 47)

65.     The auditors were not given any instructions by the Local 5 funds regarding the determination of the location of the work. (Tr. p. 47)

66.     There is no specific request by the Local 5 funds for records pertaining to job location. (Tr. p. 49)

67.     Contribution reports that Cork submitted to other locals and documents from other locals that show hours reported to them are sufficient evidence to establish that the presumed work was being done in other locals. (Tr. p. 49)

68.     Testimony or other evidence from another local that they received payment for the contribution reports submitted to them would be sufficient to overcome Local 5's assumption that all work was done in its jurisdiction. (Tr. p. 49)

69.     There is nothing in the collective bargaining agreements or the related trust agreements that prohibit an employer from making bonuses that are not based on hours worked. (Tr. p. 50)

## GARY GEBIS

Gary Gebis is the Local 5 funds auditor.  He was called as a witness and testified as follows:

70.     Gebis did not perform the work on the subject audit report. (Tr. p. 66)

71.     Gebis recalculated as hours for contribution purposes all of the time that was categorized by Cork as bonus and assumed no bonuses were paid. (Tr. p. 76)

72.     The attestation standards indicate that the procedures are merely those agreed to between the client and the accountant. (Tr. p. 110)

73.     The only reason the audit report was prepared was to assist the Local 5 funds and it does not express an audit opinion. (Tr. p. 111)

74.     The audit report makes no representation regarding the sufficiency of the procedures either for the purpose for which the report was requested or for any other purpose. (Tr. p. 112)

75.     The audit report only identifies possible additional reportable hours based on the agreed procedures. (Tr. p. 113)

76.     The audit report merely compiles data pursuant to the agreed upon procedures and just reports back the data compiled. (Tr. p. 113)

77.     The audit report does not render an opinion that the amounts contained in the audit report are actually amounts that are due. (Tr. p. 113)

78.     The audit report does not express an opinion whether the employer has complied with its contribution requirements. (Tr. p. 114 and 115)

79.     The audit report does not express an audit opinion as defined by the AICPA or by any objective auditing standards. (Tr. p. 115)

80.     Gebis is not expressing a professional CPA opinion on Cork's compliance with the contribution requirements. (Tr. p. 116)

81.     The audit report should not be used by anyone who has not agreed to the procedures or taken responsibility for the sufficiency of the procedures. (Tr. p. 117)

82.     Gebis did not render an expert opinion, did not do any of the fieldwork for the audit report, never went to Cork's premises, never talked to any of Cork's employees, never talked to any employees who received bonuses, and never spoke to any management employees. (Tr. p. 117 and 118)

83.     Gebis recalculated all bonuses (regardless of when they occurred) and assumed the bonuses were for hours worked. (Tr. p. 123)

84.     The bonuses paid in December were included on the audit report as hours worked. (Tr. p. 123)

85.     It was assumed that all of Cork's work during the audit period was performed in Local 5 territory. (Tr. p. 123 and 124)

86.     During the audit process, the auditors had documents that showed Cork did a certain volume of work outside Local 5 territory. (Tr. p. 130, 131 and 161)

87.     If Cork had a large volume of work in non-Local 5 territories, it is unreasonable to assume that all of Cork's work was in Local 5 territory. (Tr. p. 130 and 131)

88.     Procedure 14A requires the auditors to trace employees from other unions' contribution reports and eliminate the hours based on reportability to other funds. (Tr. p. 132)

89.     Local 56 is a bricklayers union. (Tr. p. 132)

90.     The auditors did not eliminate the hours reported to other unions from the audit report. (Tr. p. 134)

91.     The auditors included all of the bonus payments in the audit report and made the assumption that the bonuses were for hours worked based on the instructions received from the Local 5 funds. (Tr. p. 142)

92.     Local 5 funds are not entitled to any contributions for work performed in Local 56 territory. (Tr. p. 142)

93.     Local 5 funds are not entitled to any contributions for Cork employees working in the shop and not performing bargaining unit work. (Tr. p. 142 and 143)

94.     Gebis cannot determine how many hours his firm worked on the audit. (Tr. p. 149)

95.     Gebis compounded the interest calculation without any contractual authority to do so. (Tr. p. 152 and 153)

96.     Gebis did not perform any calculations to determine the volume of work in non-local 5 territory (even though he had documentation to do so) because he was working for the plasterers' funds and he did not think the funds should pay for him to do the calculations. (Tr. p. 157 and 158)

97.     The auditors should not have included the payments made to the widow. (Tr. p. 160)

98.     The Local 56 funds could conduct a similar audit and make the same assumptions that all individuals worked in their territory. (Tr. p. 161)

99.     Cork's payroll records show that it employed individuals who were members of Local 56 and Local 362 during the audit period. (Tr. p. 161)

100.    The auditors admit that the audit report is not one hundred percent accurate. (Tr. p. 162).

101.    The auditors admit that they do not know to what degree the audit report is inaccurate. (Tr. p. 163)

# KEVIN SCHELL

Kevin Schell is a trustee of the Local 5 funds not an officer of Local 5..  He was called as a witness and testified as follows:

102.    Schell only visited four Cork jobsites. (Tr. p. 195 and 196)

103.    Under the collective bargaining agreement it was permissible for Cork to employ members of Local 56 on job sites within the geographical jurisdiction of Local 5. (Tr. p. 207)

104.    There were never any grievances filed against Cork as a result of any job site visits. (Tr. p. 208)

105.    Schell did not talk to any Cork employees regarding bonus payments. (Tr. p. 210)

106.    Cork has no obligation to pay the Local 5 trust funds for work performed in DuPage County. (Tr. p. 213)

107.    There is no evidence that any of the bonus payments made by Cork were a subterfuge to conceal overtime work. (Tr. p. 214)

108.    There is no evidence that any of the payments made by Cork to its employees for bonuses are for something other than a bonus. (Tr. p. 214)

109.    Local 5 has never filed a grievance against Cork for failing to report any new hires to the union. (Tr. p. 217)

110.    The collective bargaining agreements contain a provision that indicates working assessments or dues is subject to arbitration. (Tr. p. 218)

111.    Local 5 has not arbitrated the issue of working assessments with Cork. (Tr. p. 218)

## CHESTER FESTER

Chester Fester is a Local 5 funds trustee and officer of Local 5.  He was called as a witness and testified as follows:

112.    The Chicago Plastering Institute is not a fund created or governed under ERISA. (tr. p. 229)

113.    No grievances were ever filed against Cork for not reporting new hires. (Tr. p. 229)

114.    Disputes over the payment of dues are subject to arbitration under the collective bargaining agreements. (Tr. p. 231)

115.    The collective bargaining agreements do not specify that an employer is obligated to maintain records that identify job locations worked by its employees. (Tr. p. 236)

## TAMMY STAMOS

Tammy Stamos was employed by Cork as a bookkeeper.  She was called as a witness and testified as follows:

116.    The bonus checks were separate checks from the payroll account and the stubs on the bonus checks indicate that the payments were for a bonus. (Tr. p. 259)

117.    Bonus payments were never made for hours worked. (Tr. p. 260)

118.    Cork employees were occasionally loaned money. (Tr. p. 260)

119.    The loans were never based on hours worked? (Tr. p. 261)

120.    Cork would occasionally help an employee purchase a truck or van. (Tr. p. 261)

121.    The sums paid by Cork to employees for the purchase of a vehicle was never predicated on hours worked and the vehicle would be used for work. (Tr. p. 262)

14

122.    John Bagjas, as a superintendent and officer of Cork, was a management employee.  (Tr. p. 263)

123.    Cork had shop labor engaged in non-bargaining unit work on Cork's premises (Tr. p. 267 and 268)

124.    Cork reported 40 hours from one week and 32 hours from another week (for deceased employee Jozef Tajstrzyk) that was inadvertently missed during a time frame when he was still alive. (Tr. p. 272 and 273)

125.    Cork properly accounted for all of Jozef Tajstrzyk's hours, put the hours on an appropriate contribution report, and submitted contributions for those hours. (Tr. p. 273)

126.    Stamos received bonuses while employed at Cork that were not predicated on hours worked. (Tr. p. 276)

127.    The bonuses paid by Cork were not predicated on hours worked. (Tr. p. 278)

128.    When shop labor employees began performing the work of a plasterer, the employees' hours were then reported to the plasterers unions.  (Tr. P. 278)

### RICHARD NEVIOUS

Richard Nevious was an employee and officer of Cork. He was called as a witness and testified as follows:

129.    Cork typically scheduled its plasterers to work in their home local. (Tr. p. 290)

130.    Nevious (when he was a Local 56 member) did most of his work in DuPage County. (Tr. p. 291)

131.    Nevious when first employed by Cork began working in the shop doing non-bargaining unit work. (Tr. p. 295 and 296)

132.     Cork would often hire new people into the shop and have them engaged in non-bargaining unit work before those individuals became plasterers. (Tr. p. 296 and 297)

133.     Cork and its managers would typically schedule plasterers to work in their home local. (Tr. p. 297 and 298)

134.     Nevious received bonuses while working at Cork. (Tr. p. 298)

135.     The bonuses were for holidays and for bringing jobs in early. (Tr. p. 298)

136.     Cork would pay bonuses to its employees throughout the year. (Tr. p. 299)

137.     The bonuses paid by Cork were never in lieu of a payroll check, never in lieu of overtime, and were never for hours worked. (Tr. p. 299)

138.     For shop labor the first payroll information coincides with their date of hire. (Tr. p. 314 and 315)

## LORAND STRANYICZKI

Lorand Stranyiczki was an employee and officer of Cork. He was called as a witness and testified as follows:

139.     Employees would receive a bonus if a job came in early. (Tr. p. 345 and 346)

140.     Bonus pay was in addition to the other pay an employee would received for hours worked. (Tr. p. 346)

141.     Cork employees typically did not work weekends.

142.     Stranyiczki never worked any hours for which he was paid cash. (Tr. p. 346)

143.     Cork employed shop labor during the audit period to engage in non-bargaining unit work at Cork's premises. Shop labor did not do plastering work. (Tr. p. 347 and 348)

144.     Stranyiczki worked in the shop when first hired by Cork. (Tr. p. 348)

145.    Stranyiczki (when a member of Local 56) did most of his work in Local 56 territory. (Tr. p. 348)

## JOHN BAGJAS

John Bagjas was employed by Cork as a Superintendant and President.  He was called as a witness and testified as follows:

146.    The amount of hours and contributions reported to the funds were equal to the amount of compensation Bagjas received in that month. (Tr. p. 358)

147.    It was a company policy for Cork to assign its plasterers to their home local. (Tr. p. 361 and 362)

148.    Lake County plasterers only worked in Lake County. (Tr. p. 362)?

149.    Local 56 employees typically worked in DuPage County. (Tr. p. 362)

150.    95% to 99% of the time plasterers were assigned to work in their home local. (Tr. p. 362)

151.    Bagjas received bonuses while employed at Cork. (Tr. p.358 and 362)

152.    Bonuses would be paid throughout the year for getting a job done on time or early, and there were always holiday bonuses at the end of the year. (Tr. p. 362 and 363)

153.    Cork had a policy of giving bonuses to employees that would bring a job in early. Typically, Cork would share a portion of the savings with the plasterers on that crew.  The bonus payments would be in addition to their regular hourly pay for the hours that the plasterers worked on that job. (Tr. p. 374 and 375)

154.    The bonuses were based on something other than hours worked. (Tr. p. 375)

155.    Cork was generous with bonuses while Palicsek was president of the company. (Tr. p. 377)

17

156.    Cork also provided money to various employees to assist them in the purchase of a vehicle. (Tr. p. 377)

157.    Cork had crews made up of Local 56 members.  Cork had crews made up of Local 5 members.  Cork made up their crews in this fashion because they had work in both Local 56 and Local 5 territories.  Whenever possible Cork would send a 56 crew into 56 territory and a Local 5 crew into Local 5 territory. (Tr. p. 379 and 380)

158.    Cork used shop labor on its premises to do non-bargaining unit work, including equipment maintenance and material handling.  The shop labor did not do plastering work. (Tr. p. 382)

159.    Occasionally, a shop employee would become a plasterer.  Cork would then report that individual's hours on a contribution report and submit it to the union. (Tr. p. 383)

160.    Most of Cork's plasterers worked all year. (Tr. p. 392)

161.    Cork's plasterers did not typically work overtime. (Tr. p. 397)

162.    It was company policy (for over 10 years) to assign plasterers to work in their home local. (Tr. p. 399)

### DOUG WASILEVICH

Doug Wasilevich was employed by Cork as an estimator.  He was called as a witness and testified as follows:

163.    Wasilevich was a contact person for general contractors. (Tr. p. 502)

164.    Wasilevich  receivescalls from general contractors for Cork to commence work on the project. (Tr. p. 502)

165.    Cork would often need to hold off on a job until a crew was available for that territory. (Tr. p. 503)

166.     Cork's plasterers were assigned to work in locations based on their home local. (Tr. p. 504)

167.     Cork had  crews for Local 5 work and crews for Local 56 work. (Tr. p. 504)

168.     Jobs were often delayed because a proper crew was not available. (Tr. p. 505)

169.     Wasilevich received bonuses when he worked at Cork. (Tr. p. 506)

170.     Cork employed shop labor to do non-bargaining unit work. (Tr. p. 506)

### FRANKLYN LEE

Franklyn Lee is Defendant's expert.  He was called as a witness and testified as follows:

171.     An agreed upon procedure engagement is one where the accounting firm is asked to perform certain procedures and then report upon those procedures.  Those procedures are only governed by the engagement. (Tr. p. 514)

172.     The engagement letter provided specific procedures that P & G was to perform and governs the conduct of their work. There were several items reported that were outside of the scope of the engagement. (Tr. p. 522)

173.     The procedures followed by Piotrowski & Gebis in making their findings did not comply with their agreed upon procedures. (Tr. p. 524, DX 20)

174.     Procedure No. 14A requires that every employee who is reportable to another fund should be traced and eliminated from the audit report. (Tr. p. 525, DX 20)

175.     There is nothing in P & G's letter  (which requests records to be furnished for the audit) that indicates Cork needs to provide information regarding job location. (Tr. p. 528, JX 6)

176.     Piotrowski & Gebis did not follow procedure 14A, although they traced the employees reported to the Local 56 funds, they did not eliminate them from the audit report. (Tr. p. 530)

177.    Piotrowski and Gebis did not follow procedure 14A.  They traced the contributions from other union reports, but they did not eliminate on the basis of reportability to other funds. (Tr. p. 530 and 531)

178.    Piotrowski & Gebis did not follow their agreed upon procedures engagement in compiling hours for bonus pay.  There is no basis for their determination that bonus payments represented additional hours to be reported. (Tr. p. 531)

179.    Piotrowski & Gebis did not comply with their agreed upon procedures in listing possible additional reportable hours for persons classified as shop labor because the shop labor should have been eliminated under audit procedure 14B. (Tr. p. 533, DX 20)

180.    Procedures that were performed outside of the engagement are not be part of the engagement. (Tr. p. 538 and 539)

## GEORGE PALICSEK

George Palicsek was employed by Cork as an officer.  He was called as a witness and testified as follows:

181.    There was a territorial war between  Local 5 and Local 56. (Tr. p. 553)

182.    Local 5 lost the election at Cork. (Tr. p. 554)

183.    Cork assigned its plasterers to work in their home local 99 % of the time. (Tr. p. 559)

184.    Contributions were paid to a union for every hour that was worked by a plasterer. (Tr. p. 561)

185.    Cork produced invoices that show the location of the work performed during the audit period. (Tr. p. 561 and 562)

186.    Local 5 was always the least expensive, Local 56 was between $2 to $3 more per hour, and Local 11 was the most expensive union.

187.    If given a preference, Cork would use Local 5 plasterers. (Tr. p. 562)

188.    There is no advantage to Cork for a Local 56 plasterer to work in Local 5 territory.  Local 56 is more expensive.  There would be a financial advantage for members of Local 5 to work in Local 56 territory, but Cork could not do that because Local 56 heavily guarded its territory. (Tr. p. 563 and 564)

189.    Cork gave bonuses to its plasterers for holidays and for bringing a job in early. (Tr. p. 565)

190.    Bonuses were never paid for hours worked. (Tr. p. 566)

191.    Cork hired individuals to work in its shop on Cork's premises to take care of equipment, paint and do other non-bargaining unit work. (Tr. p. 569)

192.    John Bagjas worked at Cork as a field superintendent and management employee during the audit period. (Tr. p. 590)

193.    Cork's general rule was to assign plasterers to their home local. (Tr. p. 571 and 572)

194.    The hours worked on a job can be determined from the invoice by backing out the material and other costs, and then dividing the remainder by the hourly rate. (Tr. p. 572)

195.    Jobs in Cook County (Local 5's territory) are more expensive due to increased costs for laborers and subcontractors, which are not expenses associated with non-Cook County jobs. (Tr. p. 572)

196.    The City of Chicago did not allowed EIFS unless a water management system was installed, which adds between 40 % to 60 % to the contract.  Most Chicago jobs were stucco instead of EIFS.  Stucco jobs require subcontractors for lathing and the framing. (Tr. p. 572)

197.    Local 56 jobs were 99 % EIFS which did not require as many laborers or subcontractors. (Tr. p. 572 and 573)

198.    Cook County jobs were more expensive than the same job in Local 56. (Tr. p. 577)

199.    Cork charged more for Cook County jobs. (Tr. p. 585)

### JOZEF OMYLAK

Jozef Omylak was a plasterer with Cork who was fired for cheating on his time cards.  He was called as a rebuttal witness and testified as follows:

200.    While employed at Cork, Omylak did most of his plastering work in Cook County and all of his work in Local 5 territory.  He did not do any work in Local 56. (Tr. p. 652)

201.    Cork paid bonuses to Omylak for "good work".  (Tr. p. 636)

202.    After being fired from Cork, Omylak with the assistance of Local 56 attended a meeting at Local 56 for the express purpose of finding individuals to sue Cork. (Tr. p. 646)

203.    Cork settled Omylak's claim to avoid  problems with Local 56. (Tr. p. 649)

To the extent (if any) that the foregoing proposed Findings of Fact as stated may be deemed Conclusions of Law, they shall also be considered Conclusions of Law.  In the same manner, to the extent (if any) that the following matters expressed as Conclusions of Law may be deemed Findings of Fact, they shall also be considered Findings of Fact.  See Miller v. Fenton, 474 U.S. 104, 113-14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

## PROPOSED CONCLUSIONS OF LAW

204.     Plaintiffs' claim for damages is based upon PX 11, which is the Report on Agreed

Upon Procedures prepared by Piotrowski & Gebis ("Report").  The report as admitted by Gary

Gebis is not 100% accurate and the auditors cannot state to what degree it is inaccurate.

Accordingly, the report is completely unbelievable and does not constitute evidence.  See,

Paddack v. Dave Christensen, Inc., 745 F.2d 1254, 1259-60 (9th Cir. 1984).

205.     Plaintiffs maintain the burden of proof that they are entitled to damages, i.e.,

contributions.  See, Chicago District Council of Carpenters v. Reinke Insulation Company, 347

F.3d 262, 265 (7th Cir. 2003).  The audit report is based in part on inadmissible hearsay.  The

assumption made that all work was performed in Local 5's jurisdiction is neither part of P&G's

Agreed Upon Procedures nor subject to cross examination since P&G relied upon unverifiable

sources to establish contributions allegedly owed by Defendant.  The truth of that which was

asserted implicates the traditional hearsay dangers.  Likewise, P&G's assumption that all bonus

payments represent payments for all actual hours worked is not supported by any evidence

because Gary Gebis merely treated bonus payments as hours worked because there were a lot of

them.  As a result, Federal Rule of Evidence 1006 clearly excludes evidence of records that

contain both admissible and inadmissible hearsay.  See, Paddack v. Dave Christensen, Inc., 745

F.2d 1254, 1259-60 (9th Cir. 1984).  See also, Soden v. Freightliner Corp., 714 F.2d 498, 506 (5th

Cir.1983) (summary charts based on statistics that were based on letters and conversations found

inadmissible); 5 D. Louisell & C. Mueller, Federal Evidence, §599 at 36 (1983 Supp.) ("Where

summary proof is offered, ordinarily it amounts to 'evidence' particularly where the underlying

material was not itself admitted or was not as practical matter examinable by the jury.  In such

cases, it is especially important to insure that the summary rests entirely upon admissible

evidence.")

206.     The proponent of the hearsay is entitled to admission of only those portions that he can demonstrate are entirely admissible.  See, United States v. Johnson, 594 F.2d at 1255; Cf. Wilkes v. United States, 80 F.2d 285, 291 (9th Cir.1935) applying common law predecessor of Rule 1006 to exclude accountants' summaries because proponent could not segregate admissible from inadmissible); McCormick on Evidence, §51 at 125 (E. Clearly 3d ed. 1984) ("if part of the evidence offered...is admissible and a part is not, it is incumbent on the offeror, not the judge, to select the admissible part.  If counsel offers both good and bad together and the judge rejects the entire offer, the offeror may not complain on appeal.")

207.     The Chicagoland Construction Safety Council, Chicago Plastering Institute and the Journeymen Plasterers' Protective and Benevolent Society of Chicago Local No. 5 ("Union") are not employee welfare plans within the meaning of §3(1) of Title I of ERISA. The CEA is not an ERISA fund.  Regardless of whether payments were made to the Local 5 Funds or the BAC Funds, the CEA contributions are forwarded to CEA.   Defendant has already paid the CEA Fund, thus it does not owe any additional money to such fund.  The CPI is not an employee benefit plan.  The Chicago Plastering Institute has no standing to sue under ERISA, §502, 29 U.S.C. §1132(a).

208.     The collective bargaining and trust agreements do not require Cork to keep of records relating to job locations.  Accordingly, any failure of Cork to keep such records does not justify imposing any such obligation upon Cork.  ERISA, 29 U.S.C. §1059(a)(1), states that an employer shall maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees.  To the extent such statute requires Cork to keep job location records, such requirement does not apply to the CEA, CPI, or Local 5

24

since they are not governed under ERISA.

209.     In Illinois Conference of Teamsters and Employer Welfare Fund v. Steve Gilbert Trucking, 71 F.3d 1361, 1367 (7th Cir. 1995), the Seven Circuit stated that under ERISA an employer must keep records of its employees' hours in order to permit the calculation of benefits and that where the employer has failed to keep adequate records, the burden shifts to the employer to come forward with evidence that the Funds' calculation of damages is not accurate. However, this rule only applies to motions for summary judgment. For purposes of trial, a burden-shifting analysis does not apply at trial. See Carpenters v. Reinke, 347 F.3d 262,265 (7thCir. 2003); see also, Carpenters Fringe Benefit Funds of Illinois v. McKenzie Engineering, 217 F.3d 578, 584 (8thCir. 2000).

210.     This case was tried and Cork produced an explanation of where its work was being done and how its plasterers were assigned to work. Cork also backed up its explanation with documentary evidence, i.e., contribution reports and invoices. As in Reinke, the Local 5 funds do not have any documentary evidence that conflicts with multiple witnesses' testimony that 95% to 99% of the time the plasterers were working in their home local. Additionally, the auditors did not interview any plasterers about where they worked, nor was any evidence presented at trial by the Local 5 funds that plasterers were typically working outside of their home local. Even if a burden-shifting analysis applies, the assumptions made by P & G are unreasonable and invalid.

**Unreasonable and Invalid Assumptions**

211.     The assumptions made by the auditors are that, (1) all work done by Defendant between 1993 and 2002 was performed in Local 5's geographical jurisdiction, (2) all bonus payments made by Defendant constitute compensation for actual hours worked and are not true

bonuses, (3) contributions must be made to Local 5 for all of Defendant's employees including shop labor and management employees engaged in non-bargaining unit work, and (4) all work in Lake County was done by Local 5 members. These assumptions are invalid and unreasonable. Defendant produced copies of invoices for all work performed by Defendant in non-local 5 territories and spread sheets showing the hours reported to trust funds other than Local 5's trust funds. Analysis of the labor costs and man-hours further highlight the invalid and unreasonable assumptions and support Defendant's position that it consistently and properly reported hours to the correct funds. Additionally, Defendant assigned its crews to work in the geographical area based on the plasterers' home local. No contributions are due to Plaintiffs for work performed in the geographical jurisdiction of Local 56/74.

**No Contributions Are Due for Work Performed Outside
of Local 5's Jurisdiction or for Contributions Paid to Local 56**

212.     The color coded Audit Report is marked in yellow to reflect hours reported and contributions paid to Local 56. Local 56 produced documents evidencing the hours reported and contributions paid for work performed in Local 56 territory. DX 3. When the employees hours scheduled on the audit report are compared with the documents establishing payment to Local 56, it becomes clear that Local 5 is claiming amounts due for contributions already paid to Local 56 for work done in Local 56 territory. Local 5 claims it is entitled to make the assumption that all of Cork's work was done in Local 5 territory. Cork produced copies of invoices for all work done in non-local 5 territories during the audit period. It is stipulated that the volume of non-Local 5 work during the audit period is $13.6 million. The Plaintiffs argue the evidence establishing the volume of the work in non-local 5 territories is insufficient. However, the stipulation in and of itself is an acknowledgement of work performed outside of Local 5's

26

territory which highlights the unreasonableness of the Plaintiff's assumption that all work during the audit period was performed in Local 5's territory.

213.     There is no basis to assume that all of Defendant's work was performed in Local 5's jurisdiction or, as set forth below, that all bonus payments were for actual hours worked.  See e.g. Carpenters Fringe Benefit Funds of Illinois v. McKenzie Engineering, 217 F.3d 578583 (8th Cir. 2000).  (There is no basis to assume that every employee on every one of the employer's projects was covered by the collective bargaining agreement; thus; the auditor's assumption that the employer owes contributions to the plaintiffs as opposed to another union's trust fund for every hour worked by an employee for whom no contributions were made was contractually unwarranted).  Gary Gebis also testified that he had records showing Defendant worked outside of Local 5 jurisdiction.  Gerald Holdway also admitted that Defendant worked outside of Local 5's jurisdiction. Accordingly, the assumption that all of Defendant's work was performed in Local 5's jurisdiction is unreasonable and invalid.

214.     Mr. Palicsek described the methodology for pricing jobs and explained how the man-hours can be determined for each job.  Cork has also provided a spread sheet showing the hours reported to the various unions during the audit period.  When the labor costs (and man-hours) are analyzed on each invoice and compared to the hours reported to Local 56, it is clear that the hours reported are consistent and properly reported.  It is unreasonable for Local 5 to maintain its position that all work was done in Local 5 territory when the invoices for work done in non-local 5 territory are $13.6 million.  It is also significant to note the testimony of Local 5 representative Gerald Holdway who states that the evidence produced by Local 56 and the invoices should be sufficient to eliminate the hours from the audit report.   Additionally, there is corroborating testimony that Cork assigned its crews based on the home local and that there was

ample work in Local 56 for its employees who were members of Local 56. It is undisputed that Local 5 has no valid claim for contributions for work done in Local 56 territory. (These unfounded claims result in over 2/3 of the Plaintiffs' total claim).

215.     Additionally, the dollar volume for work in Cook County will be greater even though the Plasterer's hours would be the same. This is due to the increased cost for laborers and subcontractors which are not typical expenses in non-Cook County jobs. Accordingly, any comparison on a dollar volume basis requires the dollar volume in Local 5's jurisdiction to be discounted by the extraordinary costs.

### No Contributions Are Due For Employee Bonuses

216.     The bonuses paid by Cork are highlighted in orange on the color coded audit. The collective bargaining agreement does not prohibit bonuses or additional compensation not predicated on hours worked. Cork provided holiday bonuses and other discretionary bonuses when employees performed well or brought a job in on time. These bonuses were not based on hours worked and were awarded solely on management discretion. Although it is difficult for Local 5 to accept the benevolence of an employer, when Cork was doing well financially it also rewarded its employees. By Local 5's own admissions, no contributions are due for bonuses. Cork has produced payroll records establishing that the orange highlighted entries on the audit report are in fact bonuses. The unfounded claims for contributions on bonuses should be dismissed.

217.     In the audit report, P&G assumed that the payments designated by G&J as "bonuses" were payments for hours worked and assessed contributions for those hours on the final audit report. With regard to Plaintiffs' claims that all payments made for "bonuses" are for actual hours worked, Plaintiffs have not offered anything more than speculation in this regard.

Gary Gebis also testified that he included bonuses, which apparently include holiday bonuses, in the report because of their timing and there were a lot of them. Conjecture alone is insufficient for Plaintiffs to meet their burden.

218.    The collective bargaining agreement does not prohibit bonuses or additional compensation not predicated on hours worked.  No contributions are due to the Local 5 Funds for bonus payments made to plasterers that are not predicated on hours worked or in lieu of wages.  These bonuses were not paid for hours worked.  Defendant does not owe contributions to the Plaintiffs based upon such bonuses.

### No Contributions Are Due For Shop Labor

219.    Shop labor is highlighted in pink on the color coded audit report.  Cork maintained a shop and would hire employees to do non-bargaining unit work in the shop.  For example, washing vehicles, changing oil, maintaining machinery, scraping and painting scaffolding, janitorial, and loading or unloading of trucks.  If the employee expressed an interest in plastering and was otherwise dependable as a shop employee, Cork would encourage the employee to contact one of the unions to inquire about the apprentice program.  Local 5 is claiming contributions for shop labor doing non-bargaining unit work if the employee was subsequently enrolled in the union.  By Local 5's own admissions no such contributions are due. (Stip at ¶50 and 53)

### No Contributions Are Due for Management Employees

220.    Plaintiffs' claims for contributions for management employees not engaged in bargaining unit work are also unfounded.  All hours coded in purple on the audit report by Cork designate hours calculated as additional hours worked in the audit report and for which Cork

claims were hours worked by management individuals and not for bargaining unit work for which contributions are due. Contributions are not due for hours worked by management individuals in non-bargaining unit work. (Stip at ¶51 and 54). John Bagjas clearly testified that he was not engaged in bargaining unit work during the audit period, and was employed during that time frame as a superintendent or an officer of the company.

## **Working Assessments**

221.     Defendant does not owe Local 5 assessments or union dues. The agreements provide for binding arbitration and require Local 5 to arbitrate rather than litigate disputes over union assessments or dues. Any and all doubts about the arbitrability of disputes in favor of arbitration. United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrier & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.ED.2d 1424 (1960). NLRB v. Keller-Crescent Co., Div. of Mosler, 538 F.2d 1291, 1297 (7th Cir. 1976) (citation omitted). The unmistakable policy of Congress has been that final adjustment by a method agreed upon by the parties is the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement." Keller-Crescent, 538 F.2d at 1300 (citations omitted).

222.     Local 5's claim for assessments or union dues must be arbitrated even though they waited until after the agreement with Defendant terminated to bring its claim. Nolde Brothers v. Local No. 358, Bakery & Confectionery Workers Union, 430 U.S. 243, 97 S.Ct. 1067 (1977). In addition, Section 302(a) of the Labor Relations Management Act, 29 U.S.C. 186(a), prohibits payments from an employer to a labor organization such as Local 5. The Labor Relations

Management Act, 29 U.S.C. 186(c)(4), provides for an exception that allows employers to deduct union dues from an employee's wages for those employees that have authorized such deduction in writing.  Defendant does not owe assessments for the following individuals since they have not authorized deductions from their wages:  Esiquio Arellano, Alexandru Bakk, Cristobal Cardenas, Jaime Cardenas, Jose Cardenas, Ricardo Cardenas, Arpad Csek, Gildardo De Luna, Roberto De Luna, Jan Dobrzanski, Marian Dykas, Eleazar Esparza, Erasmo Esparza, Lauro Esparza, Manuel Esparza, Maruicio Esparza, Medardo Esparza, Omar Esparza, Sigifredo Esparza, Valente Esparza, Rigoberto Flores, Krzysztof Glowacki, Baltazar Guerrero, Kormany Gyula, Ruben Herrera, Vaidas Jonkus, Zoltan Kis,  Felipe Martinez, Jose C. Martinez, Jose E. Martinez, Juan Mendez, Adrian Orozco, Abraham Ramos,  Jesus Rosales, Carlos Rodriguez, Carlos Rodriguez, Geronimo Sanchez, Radoslaw Siakala, Joseph Sispensa, Lorand Stranyiczki, Josef Tajstrzyk, Chris Traian, John Trent, Isidro Valadez, Jose Valadez, Jr., Jorge Vasquez, and Chris Viorel.

223.    Even if Local 5 was not required to arbitrate its claim for assessments, Local 5 failed to timely assert its claim for assessments prior to the expiration of six months after the assessments were alleged to be owed.  As a result, Local 5's claim for assessments is barred by the statute of limitations.  <u>DelCostello v. International Brotherhood of Teamsters</u>, 462 U.S. 151, 172 (1983).

### CEA/Safety Counsel

224.    The claims for contributions for CEA are also unfounded.  The CEA is not an ERISA fund.  Regardless of whether payments were made to the Local 5 Funds or the BAC Funds or the BAC Funds, the CEA contributions are forwarded to CEA.  Accordingly, these contributions have already been made by Cork.

**Deceased Employee**

225.     A deceased employee is highlighted in blue on the color coded audit report.

Defendant's employee, Josef Tajstrzyk, was killed in a car accident on May 9, 1997. (Stip at

¶57).  Defendant issued checks in the name of this employee after his death for the benefit of his

widow and not for hours worked.   Defendant does not owe Plaintiffs for these payments.

WHEREFORE, Defendant, Cork Plastering Co., Inc., by its undersigned counsel,

respectfully requests the entry of an order granting judgment in its favor against the Plaintiffs, as

further set forth above, and for such other relief as the Court deems appropriate.


BERGLUND & NIEW, P.C.

By:_  /s/ Joseph P. Berglund
        Joseph P. Berglund


NEALIS & GARROW

By:_  /s/  Alan Garrow
        Alan Garrow


Joseph P. Berglund
BERGLUND & NIEW, P.C.
900 Jorie Boulevard, Suite 122
Oak Brook, Illinois 60523-2229
(630) 990-0234
ARDC No. 6202851

Alan Garrow
Nealis & Garrow
510 South Batavia Avenue
Batavia, Illinois 60510
(630) 879-1213
ARDC No. 6198651